[Crim. No. 7879. First Dist., Div. Two. Nov. 23, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH TIFFITH, Defendant and Appellant.

[redacted]

## COUNSEL

Robert J. Jaffe, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, John T. Murphy, George R. Nock and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SHOEMAKER, P. J.**—This is an appeal by defendant Joseph Tiffith from a judgment convicting him of kidnaping, robbery and auto theft.

The evidence may be summarized as follows: Evangeline Bustamante testified that on October 10, 1968, she left her home at 7:30 a.m. to warm

up her car before driving her daughter to a babysitter. She took with her a wallet containing $125 to $130 in currency. Mrs. Bustamante got into her car, placed her wallet on the dashboard and turned on the engine. She then decided to get out of the car in order to clean the fog from the windows. As she was getting out of the car, she saw defendant standing approximately 2 feet from her. She screamed, and defendant told her to shut up because he had a gun and had shot two people. He showed her a .22 caliber pistol and ordered her to get back into the car and crouch down on the floor of the passenger side of the car. Mrs. Bustamante was unable to fit herself completely into the space defendant had indicated, and she ended up with her head on the seat and the rest of her body on the floor. Defendant, who was holding the gun in his left hand, ordered her to cover her head and to stop looking at him.

Mrs. Bustamante testified that defendant then drove for a considerable distance and ultimately stopped the car in an alley. The door on the passenger side of the car was locked, and defendant removed the door lock button to prevent Mrs. Bustamante from opening the door. Defendant had asked her, while driving to the alley, if she had any money, and she had replied that she had about $20. After arriving in the alley, defendant looked in her wallet and found that it actually contained $125 to $130. After going through her wallet, defendant removed the maroon shirt he was wearing and put on a black pullover sweater. He then informed Mrs. Bustamante that the gas tank was empty and that he intended to drive to a service station. He told her that he did not want her to look suspicious, and he ordered her to get up off the floor and put on a pair of dark glasses which were lying on the floor of the car. After she had complied with these instructions, defendant looked through the glove compartment and found the owner's manual. He gave it to Mrs. Bustamante and ordered her to read it and not to look up for any reason.

Defendant then drove to a service station and instructed the attendant to fill the car with gas. While he was talking to the attendant, Mrs. Bustamante grasped the metal screw from which defendant had removed the door lock button and pulled it up to release the lock. She was reaching for the door handle when defendant observed her action and ordered her to stop what she was doing or he would get mad. Mrs. Bustamante waited until defendant was paying the attendant for the gas, and she then reached for the door handle a second time and succeeded in opening the door and jumping from the car. She then ran to a nearby house and telephoned the police.

At approximately 8:50 a.m., Highway Patrol officers stopped defendant driving the victim's car, having been advised by radio report of the kidnaping and auto theft. They arrested defendant and searched him and the car.

In defendant's back pants pocket the officers found loose currency in the amount of $120 or $125. A woman's wallet, which contained no money, was found in the console of the car, and a .22 caliber pistol was found beneath the driver's seat. Defendant was advised of his constitutional rights and declined to say anything to the officers.

Two of Mrs. Bustamante's neighbors testified that on the morning of October 10, they had heard her scream and had seen a man force her into her car and drive away from her home.

Defendant, testifying on his own behalf, stated that at 7:30 a.m. on October 10, he was involved in an automobile accident. Defendant stated that he drove into a parked car and struck his head on the steering wheel, causing it to bleed. His mind became sort of blank following the accident, and he felt that he should go to a hospital. Defendant left the scene of the accident and walked until he saw a lady who was near a car. He approached her with the intent of asking her to take him to the hospital, but she screamed when she saw him and noticed the blood on his head. Defendant testified that he blacked out when the lady began screaming and that he could remember nothing thereafter until he was in a service station. There was a lady in the front seat, and she jumped out of the car and ran off. His next recollection was of the officers stopping him and asking him questions.

Defendant also testified, on direct examination, that on January 27, 1968, when he was confined in the county jail, he wrote his mother a letter stating that he was guilty of kidnaping, robbery and auto theft. Defendant explained that he had made this statement in the letter because he did not know at the time exactly what had happened on the morning of October 10 and the "jail house lawyers" with whom he was confined had told him that he would never be able to prove his innocence and that everyone in the jail would be sent to Vacaville.

It was stipulated that if Mrs. Bustamante were called as a rebuttal witness, she would testify that she had observed no blood on defendant's head.

The jury returned a verdict finding defendant guilty of simple kidnaping (a lesser offense included within the charge of kidnaping for purposes of robbery), first degree robbery and auto theft. The jury also found that defendant was armed with a deadly weapon at the time of the commission of the auto theft.

■ Defendant first contends that the trial court erred in failing to instruct the jury, on its own motion, that simple assault (Pen. Code, § 240), assault with a deadly weapon (Pen. Code, § 245, subd. (a)) and brandishing a firearm (Pen. Code, § 417) were lesser offenses included within the charge of robbery. This contention is without merit.

■ A trial court has the duty to instruct on lesser included offenses on its own motion where such instructions bear upon those principles of law commonly or closely and openly connected with the facts of the case before the court. (*People* v. *Hood* (1969) 1 Cal.3d 444, 449-450 [82 Cal.Rptr. 618, 462 P.2d 370].)

■■ In the instant case, if it be assumed that simple assault, assault with a deadly weapon and brandishing a firearm may all properly be deemed lesser offenses included within the charge of robbery, it is nevertheless clear beyond a doubt that instructions on said offenses would have been totally inappropriate in view of the facts of this case.

Defendant did not attempt in any way to contradict the victim's testimony as to the events which transpired on the morning of October 10. Her testimony left no doubt that defendant was guilty of first degree robbery. Defendant based his defense solely on his own testimony that he blacked out and was unable to recall having engaged in any criminal conduct whatever. Unconsciousness is a complete defense to a criminal charge (Pen. Code, § 26, subd. 5; *People* v. *Conley* (1966) 64 Cal.2d 310, 323 [49 Cal.Rptr. 815, 411 P.2d 911]), and it is apparent that defendant elected to present the jurors with the simple choice of acquitting him if they believed his testimony or finding him guilty of first degree robbery if they did not.

We find a similar situation in *People* v. *Carter* (1969) 275 Cal.App.2d 815 [80 Cal.Rptr. 202], where it was contended on appeal from a robbery conviction that the court erred in failing to instruct on its own motion on the lesser included offense of simple assault. The appellate court, in rejecting this contention, stated: "According to any objective view of the evidence the case seemed to call for a verdict of acquittal or one of second degree robbery. Thus, if either defendant wanted to give the opportunity of a compromise verdict of simple assault, he should have requested it. The failure to instruct on simple assault was not error." (P. 823.)

■■ Defendant next contends that the trial court erred in refusing to grant his request for a continuance and for a substitution of counsel.

The record shows that on the morning the case came on for trial, defendant appeared with his attorney, an assistant public defender. Defense counsel requested a continuance on defendant's behalf and advised the court that defendant had made certain communications to his mother and wished to bring out the full background of these communications by having his mother and sister testify. The court asked defendant if his counsel had correctly stated his request, and defendant replied that he had. The court then stated that since no evidence would be taken that day and the prosecution's witnesses would take up most of the following day, there would be ample time

for defendant's witnesses to be brought into court without the necessity of a continuance. Defense counsel stated that he would immediately issue subpoenas for defendant's mother and sister.

Defense counsel also informed the court that he was not sure whether defendant wished him to continue representing him. He explained that he had pointed out to defendant certain legal defects in the case for the defense and that defendant had then become dissatisfied and had expressed the view that he wanted different counsel because he felt that an attorney who did not vigorously agree with his client's point of view could not adequately represent him. The court advised defendant that an attorney had a duty to fairly evaluate his client's case based upon the attorney's legal training and experience. The court stated that if defense counsel's proper performance of this duty was the only reason for defendant's wish to discharge him, the request for different counsel would be denied. Defendant apparently acquiesced in the court's ruling and failed to indicate that he had any other basis for his dissatisfaction with his attorney.

In the light of this record, the court did not abuse its discretion in denying defendant's requests for a continuance and for substitution of counsel.

Defendant next contends that he was deprived of adequate representation at the trial because his attorney failed to produce crucial evidence favorable to the defense, elicited damaging admissions from defendant on direct examination and failed to effectively argue in support of a motion made by defendant at the end of the trial. We do not agree.

█ With regard to counsel's alleged failure to produce evidence favorable to the defense, defendant asserts that his testimony that he had been involved in an automobile accident on the morning of October 10 could have been corroborated by certain police records allegedly in existence. It suffices to point out that the documents in question were not before the trial court and are not part of the record on appeal.

█ Defendant's claim that his attorney demonstrated his incompetence by eliciting damaging admissions from defendant during direct examination is likewise without merit. Although it is true that defense counsel did question defendant concerning a letter he had written to his mother and asked defendant to explain why he had told her he was guilty of kidnaping, robbery and auto theft, we can see that defense counsel was merely attempting to mitigate the effect of evidence which he knew would be brought out on cross-examination. Defendant asserts that his attorney ought not to have questioned him about the letter because "it is doubtful" whether the prosecutor could have introduced the letter into evidence if defendant had not first raised the issue himself. Defendant points out that during a colloquy

between court and counsel which took place after the jury had retired to deliberate, defense counsel stated that it was the district attorney's office which had furnished him with a Xerox copy of the letter defendant had written to his mother. Defendant reasons that since the letter was written by him while he was confined in county jail, it must have been intercepted by the county sheriff's office and transmitted to the district attorney's office to be copied. He argues that this conduct was somehow unlawful and that the letter could not have been used as evidence against him had defense counsel not raised the issue first himself.

■ Defendant does not challenge the fact that penal authorities have the right to inspect communications between prisoners and members of the outside population. *In re Ferguson* (1961) 55 Cal.2d 663, 676-677 [12 Cal.Rptr. 753, 361 P.2d 417], upon which defendant relies, is authority for that proposition and merely held that prison officials should not exercise their right of inspection in such a way as to unnecessarily delay communications to attorneys or the courts.

■ In the present case, the letter which defendant wrote while confined in county jail was to his mother and not to his attorney. In *Stroud* v. *United States* (1919) 251 U.S. 15, 21-22 [64 L.Ed. 103, 111, 40 S.Ct. 50], the court upheld the admission into evidence of certain letters which tended to establish the accused's guilt and which had been written while he was confined.

The court stated: "[The letters] were voluntarily written, and under the practice and discipline of the prison were turned over ultimately to the warden, who furnished them to the District Attorney. It appears that at the former trial, as well as the one which resulted in the conviction now under consideration, application was made for a return of these letters upon the ground that their seizure and use brought them within principles laid down in *Weeks* v. *United States,* 232 U.S. 383, and kindred cases. But we are unable to discover any application of the principles laid down in those cases to the facts now before us. In this instance the letters were voluntarily written, no threat or coercion was used to obtain them, nor were they seized without process. They came into the possession of the officials of the penitentiary under established practice, reasonably designed to promote the discipline of the institution. Under such circumstances there was neither testimony required of the accused, nor unreasonable search and seizure in violation of his constitutional rights."

Under the *Stroud* case, defendant's letter to his mother could have been introduced into evidence by the prosecutor even if defense counsel had not raised the issue during his direct examination of defendant. Defense counsel was in no way demonstrating his incompetence by attempting to mitigate

the effect of damaging evidence which he knew the prosecutor would produce.

There is no merit whatever to defendant's claim that his counsel ought to have argued more effectively in support of the motion which defendant made at the end of the trial. The record is somewhat unclear as to precisely what relief defendant was seeking, but it is clear that his right to such relief was predicated upon the allegedly unlawful seizure of the letter to his mother. Since the seizure was not unlawful, it is clear that defense counsel could not have argued the point any more effectively than he did.

In view of the above, there is obviously no merit to defendant's further claim that the denial of the motion which he made at the end of the trial constituted a violation of fundamental concepts of fairness and due process. There is likewise no merit to defendant's contention that this court should reconsider its refusal to augment the record to include a copy of the letter which defendant wrote to his mother. The letter was not introduced into evidence at the trial. To the extent that its contents were relevant, they were brought out during examination of defendant and are readily ascertainable from a reading of the reporter's transcript.

Judgment affirmed.

Agee, J., and Taylor, J., concurred.

A petition for a rehearing was denied December 23, 1970.