[Crim. No. 35654. Second Dist., Div. Five. Sept. 4, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMMY RAY BROWN, Defendant and Appellant.

**COUNSEL**

Edward J. Roberts, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Weisman and Penina S. Van Gelder, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DOWDS, J.\***—Nathan Blustein, 73 years of age, was brutally beaten and robbed while taking an early evening walk near his residence on Tower Drive in Beverly Hills. Appellant, convicted of robbery and assault by means of force likely to produce great bodily injury and committed to the Youth Authority, raises a number of issues on appeal, which we shall discuss in turn. Additional facts will be set forth as necessary to a discussion of the issues.[1]

### I. CORROBORATION OF ACCOMPLICE

Appellant contends that his motion for judgment of acquittal under Penal Code section 1118.1[2] was erroneously denied in that there was insufficient evidence to sustain his conviction. In particular he maintains that a statement of Ralph Williamson, who respondent concedes was an accomplice, that appellant participated in the assault upon and robbery of Mr. Blustein, should not have been admitted into evidence and in any event his testimony and statement are insufficiently corroborated. At the trial Williamson testified that he, his sister (Trenna Zieder), appellant, Dion Smith and another male known only as Ronald or Ray (whom we shall call Ray) had ridden on a bus together to the vicinity of Wilshire and La Cienega and had stopped at a nearby restaurant. They then walked to a store on the corner of Tower Drive and Wilshire Boulevard to buy a bottle of beer, according to such testimony and he, his sister and Ray turned south of Wilshire on Tower and attacked and robbed Blustein while appellant and Dion Smith were in the store buying beer. He further testified that he, his sister, and Ray returned to Wilshire where they caught up with appellant and Dion Smith, who had just come out of the store and were on the north side of Wilshire, that

---

*Assigned by the Chairperson of the Judicial Council.

[1]Since only issue IX meets the criteria for publication, our discussion of the other issues is abbreviated.

[2]Further section references are to sections of the Penal Code unless otherwise specified.

the entire party then proceeded north on Wilshire and that appellant and Dion Smith were not told about the robbery. He admitted that he had informed Detective Michael Haigwood that appellant and Dion Smith did participate in the assault and robbery but asserted that he had lied so that he "wouldn't get all the time for [the crime]."

Detective Haigwood testified: after arresting Williamson on a warrant he had advised him of his constitutional rights from a *Miranda* warning card issued by the police department; Williamson said he understood his rights and wished to give up the right to remain silent and to speak to an attorney and have him present during questioning; he then interviewed Williamson about the crime; Williamson was asked to write out his statement but indicated he had trouble in writing; Williamson agreed that another officer might type the statement and that Williamson dictated it to that officer in Detective Haigwood's presence; immediately after it had been typed Haigwood read the statement and verified that it was an accurate rendition of what Williamson had said; Williamson then went over the statement several times and signed it; Haigwood and the other officer signed the statement as witnesses and no threats or promises were made to Williamson. Williamson's statement was admitted into evidence over numerous objections.

■ Contrary to appellant's contentions, the statement was properly admitted. Substantial evidence supported the trial court's implied finding that Williamson had been advised of and waived his *Miranda* rights[3] and that the statement was voluntarily given. The statement, as a prior inconsistent statement, fell within an exception to the hearsay rule. (Evid. Code, § 1235; *People* v. *Chavez* (1980) 26 Cal.3d 334 [161 Cal.Rptr. 762, 605 P.2d 401]; *People* v. *Green* (1971) 3 Cal.3d 981, 988-989 [92 Cal.Rptr. 494, 479 P.2d 998]; *People* v. *Loyd* (1977) 71 Cal.App.3d Supp. 1, 5 [144 Cal.Rptr. 606].)

■ It is true that Williamson's testimony and statement, as that of an accomplice, required corroboration (§ 1111) and the jury was so instructed. Direct evidence is not required for corroboration and circumstantial evidence will be sufficient. (*People* v. *Manson* (1977) 71 Cal.App.3d 1, 36 [139 Cal.Rptr. 275].) Mr. Blustein testified in pertinent part as follows: he left his residence on Tower Drive south of Wilshire to go for a walk, carrying a few dollars and some keys; he saw

---

[3]In any event, appellant has no standing to invoke Williamson's *Miranda* rights. (*People* v. *Varnum* (1967) 66 Cal.2d 808, 811-813 [59 Cal.Rptr. 108, 427 P.2d 772].)

a group of youths consisting of about four males and a female emerging from a restaurant; he watched the group walk on Wilshire to Tower and turn south on Tower and that he walked the same way, returning to his home; he saw the same youths on Tower south of Wilshire; that he saw the group coming toward him and he stopped; one of the group grabbed him by the neck and pulled him to the street and he was beaten on the face and it became black and blue and his knees and legs bled; he heard one or more members of the group saying that he didn't have any money and the attackers left; all of his clothes were taken off in the attack and when the group had left he no longer had the money or keys; he went home and his wife called his son who called the police; he had to go to the doctor four or five times and he wore bandages and remained in bed for the following two weeks except when he went to the doctor, and he had scars on his knees at the time of trial. He identified pictures of his condition after the attack which were admitted into evidence. Police Officer Thomas Lane described Mr. Blustein's condition shortly after the incident—he was in bed and moaning and seemed to be in a great deal of pain, one eye was just about closed, both cheeks were extremely puffed up with bruises under them, there were cuts and lacerations on his face and he had black and blue marks under his eyes.

Witness Gina Price was walking down Tower Drive south of Wilshire when she saw a group of three to seven males and a female running on both sides of the street. One of them threw a beer can. A few minutes later she saw an elderly man holding his shorts, which were not fully on, making his way along the street with difficulty, as though he were intoxicated or injured.

Witnesses Steven Larson and Michael Bonofiglio both testified to seeing a group in the vicinity of Tower south of Wilshire and each identified appellant as being a member of the group. When a police vehicle approached Smith and appellant shortly after the incident, they did a "double take" and began to walk away from each other despite an amplified demand that they stop.

■ Williamson's testimony and statement were sufficiently corroborated and there was sufficient evidence for a reasonable trier of fact to find that the prosecution had sustained its burden of proving appellant guilty of robbery and assault by means of force likely to produce great bodily injury beyond a reasonable doubt. (*Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People* v. *Reyes* (1974) 12 Cal.3d 486, 496 [116 Cal.Rptr. 217, 526 P.2d 225].)

## II. STRIKING OF DEADLY WEAPON CHARGE

■ Appellant further contends he was denied a fair trial because he was originally charged in count II with assault with a deadly weapon and the prosecutor waited until the end of his case, after the presentation of evidence of appellant's possession of a pool cue case possibly containing a pool cue, to ask that this portion of the charge be stricken. No error is shown. No objection was made at the trial to the striking of this portion of the information or to the admission into evidence of the pool cue case and this issue may not be raised for the first time on appeal. (See *People* v. *Ferrel* (1972) 25 Cal.App.3d 970, 976 [102 Cal.Rptr. 372].) In any event no misconduct by the prosecutor is shown. From the nature of the injuries, the fact that Mr. Blustein was unable to see exactly what was happening during the attack and the evidence from which a trier of fact might determine appellant was in possession of a pool cue, the prosecutor could well have thought until the end of his case that he might be able to sustain the assault with a deadly weapon charge. Further, the evidence of appellant's possession of a pool cue was relevant to show that appellant was part of a group that Mr. Blustein had seen in the vicinity of the restaurant as well as on Tower Drive and which other witnesses saw near the scene of the attack south of Wilshire.

## III. INCONSISTENCY OF VERDICT

Next appellant contends that, because the jury found that he did not personally inflict great bodily injury upon Mr. Blustein within the meaning of section 12022.7, its verdict of guilty in respect of count II, assault by means of force likely to produce great bodily injury, cannot stand. This contention is unavailing. ■ One who aids or abets the crime may be found guilty of an assault by means of force likely to produce great bodily injury. (§ 31; *People* v. *James* (1955) 133 Cal. App.2d 478, 480 [284 P.2d 527].) Moreover, actual bodily injury is not a necessary element of such an assault. (*People* v. *Richardson* (1972) 23 Cal.App.3d 403, 410-411 [100 Cal.Rptr. 251].) There is no inconsistency in finding that appellant did not personally inflict great bodily injury within the meaning of section 12022.7 and finding him guilty of assault by means of force likely to produce great bodily injury under section 245, subdivision (a).

## IV. USE OF INTERPRETER

A further contention is that the trial court erred in permitting Mr. Blustein's testimony to be presented through a Yiddish interpreter and denying appellant a hearing to determine if an interpreter was really necessary. The prosecutor indicated to the court that, although Mr. Blustein testified at the preliminary hearing without an interpreter, he appeared to have some difficulty with English then, that Yiddish was his first language and that he communicates more effectively in that language. The only basis for an objection urged by defense counsel was that impeachment of the witness by the transcript of the preliminary hearing would become impossible because the witness could reply that he did not understand the question at the preliminary hearing. ■ While under many circumstances it would be quite in order to hold a hearing to determine if the use of an interpreter were required, there was no abuse of discretion in failing to hold one in the instant case, certainly none that is prejudicial (Cal. Const., art. VI, § 13). The court had read the transcript of the preliminary hearing and was in a position to judge if Mr. Blustein had difficulty with the English language. No instance has been pointed out to us and we have observed none in the record where cross-examination was impeded by the device defense counsel suggested and further, it appears to us, that the witness could explain that he did not understand English well whether or not an interpreter were used at the trial. This contention fails.

## V. PROSECUTOR'S OPENING STATEMENT

The prosecutor, in his opening statement, commented that Trenna Zieder, Dion Smith and appellant had been arrested, that the members of the Beverly Hills Police Department knew from talking to witnesses that additional persons had been involved in the attack on Mr. Blustein "and Trenna Zieder led them to her brother, a young man by the name of Ralph Williamson." Appellant contends that the trial court erroneously denied his motion for a mistrial based on the quoted statement, stating that the prosecutor was well aware that Ralph Williamson was not on trial and that Trenna Zieder would not be testifying. First of all appellant's trial counsel neither objected to the statement nor moved for a mistrial and he did not join in his codefendant's objection or motion. ■ On appeal, a defendant cannot take advantage of objections made by a codefendant in the absence of stipulation or understanding to that effect. (*People* v. *Cooper* (1970) 7 Cal.App.3d 200, 205 [86 Cal.Rptr. 499]; *People* v. *Ortega* (1969) 2 Cal.App.3d

884, 894-895 [83 Cal.Rptr. 260].) ■ Further, we perceive no sign of bad faith by the prosecutor. The statement does not imply that Williamson was on trial or that Trenna Zieder would testify. It could well have been intended to mean that the police, looking for people with whom Trenna would normally associate, came upon her brother. In any event, we fail to see how the statement caused appellant any prejudice, particularly since the jury was instructed that statements of attorneys were not evidence.

## VI. VOLUNTARY STATEMENT BY VICTIM AT TRIAL

■ In response to a question by the prosecutor as to what happened to him after he was grabbed by the person who had passed him on Tower Drive, Mr. Blustein replied in effect that he had been thrown to the sidewalk, held and beaten. A colloquy took place between court and counsel as to whether the court or counsel would describe for the record a scar that the witness was pointing to. Mr. Blustein then volunteered "They beat me up so much that even when I was in the concentration camp, they didn't beat me up as much as they did." The motion of appellant's trial counsel to strike the statement was granted and the jury was instructed to disregard it. A motion for mistrial was denied. At the conclusion of the evidence the jury was instructed not to consider for any purpose any evidence that was stricken out by the court and that it must not be swayed by sympathy, passion or prejudice. At the trial appellant's counsel did not contend that Mr. Blustein was not beaten up but rather that it had not been proved beyond a reasonable doubt that appellant participated in the crime. Contrary to appellant's assertion, there was no error in denying the motion for mistrial.

## VII. STATEMENT BY VICTIM ON NIGHT OF ATTACK

■ Appellant's next contention is that the trial court erred in overruling his hearsay objection and permitting Officer Thomas Lane to testify to statements made to him by Mr. Blustein the night of the events in question, describing the persons who had attacked him. Under Evidence Code section 1240, a statement is not made inadmissible by the hearsay rule if it: "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

This exception has been explained as requiring "(1) there must be some occurrence startling enough to produce...nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it. [Citation.]" (*Showalter* v. *Western Pacific R. R. Co.* (1940) 16 Cal.2d 460, 468 [106 P.2d 895]; see *People* v. *Gonzales* (1969) 269 Cal.App.2d 586, 590 [75 Cal.Rptr. 267].) Mr. Blustein had been attacked a very short distance from his home and immediately returned there afterwards. As soon as he got home his son Phillip, who was across the street, was called home and he called the police. The police came right away, according to Mr. Blustein. Officer Lane received a call shortly after 8 o'clock and proceeded to the Blustein residence, arriving there in a minute or less. (Mr. Blustein had started his walk at about 8 o'clock.) He found Mr. Blustein in a semikneeling position, moaning, apparently in a great deal of pain and exhibiting the physical symptoms previously described. As soon as Mr. Blustein saw Officer Lane, he started talking about the incident without being asked any questions. "His demeanor or his attitude at the time was—I wouldn't say it was excited or—I wouldn't say it was calm either. I can't really put it into words. He was in a great deal of pain and he was in a kneeling position." As indicated in *Showalter* v. *Western Pacific R. R. Co., supra*, 16 Cal.2d at page 469, the trial court has some discretion in applying Evidence Code section 1240 and we cannot say that it erred in admitting Officer Lane's testimony respecting Mr. Blustein's description of his attackers.

## VIII. STATEMENT BY CODEFENDANT

Appellant's next contention is that the trial court erred in permitting Officer Donald Feil to testify, over objection, that upon the detention of Dion Smith and appellant, Smith stated that he did not know appellant and had just alighted from a bus whereas appellant stated that he had known Smith for six months and had just finished eating with him. An objection was made on the ground of hearsay and this point is wisely not urged on appeal, since Smith's statement was clearly not offered for the truth of the matter asserted. Appellant's trial counsel then proceeded "As to my client, I would ask that any statements made by the Defendant Smith be sanitized under Aranda so as not to include any reference to knowledge or lack of knowledge of De-

fendant Brown." Appellant contends on appeal that the testimony violates the rule of *People* v. *Aranda* (1965) 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 265]. The *Aranda* case requires a trial court to delete from an "extrajudicial statement of one defendant that implicates a codefendant" the parts of such statement that so implicate him. Smith's statement did not accuse appellant of the crime and in any event the admission of the statement is harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

## IX. INSTRUCTION TO JURY

Finally, appellant urges that the trial court erred in instructing the jury that "Under Penal Code Section 1203.09, the infliction of great bodily injury need not be personally inflicted by a defendant." Appellant had been charged in connection with count I (robbery) with inflicting great bodily injury upon Mr. Blustein, who was over 60 years of age and that this was known or reasonably should have been known to appellant. The jury had been provided with a verdict form upon which it was to indicate that it either did or did not find "that in the commission of the above offense [robbery], the said defendant inflicted great bodily injury upon Nathan Blustein, who was, and whom said defendant knew or reasonably should have known, was sixty years of age and older, within the meaning of Section 1203.09 Penal Code."[4] The instruction was given in response to an inquiry from the jury during deliberations reading: "Information in reference to Count I and the paragraph pertaining to Section 1203.09. 1, does find mean that the named defendant individually did personally inflict great bodily injury; or 2, that the named defendant was part of a group which did inflict great bodily injury, i.e., the defendant aided and abetted in the great bodily injury?" Following the instruction the jury returned a verdict in which it found that in the commission of the robbery appellant did inflict great bodily injury upon Nathan Blustein, who was, and whom appellant knew or reasonably should have known was 60 years of age or older, within the meaning of section 1203.09 of the Penal Code.

---

[4]Section 1203.09 prohibits the grant of probation or the suspension of execution or imposition of sentence if a person commits or attempts to commit certain crimes, including robbery, against "a person who is 60 years of age or older; or against a person who is blind, a paraplegic, or a quadriplegic, and such disability is known or reasonably should be known to the person committing the crime; and who during the course of the offense inflicts great bodily injury upon such person." As the question is not before us, we express no opinion as to whether the Legislature intended to include being 60 years of age or older within the term "disability."

In response to another inquiry on the verdict form, the jury *did not find* that appellant, in the commission of the robbery "did personally inflict great bodily injury upon Nathan Blustein, within the meaning of Section 12022.7 Penal Code." Accordingly, it must have made its finding under section 1203.09 on the basis that he aided and abetted in the infliction of the great bodily injury without personally inflicting it. Whether one is ineligible for probation under section 1203.09 if he aids and abets a robbery involving the infliction of great bodily injury upon a person 60 years of age or older, but does not personally inflict such injury, is, so far as we can ascertain, a question of first impression. The trial judge reasoned, and respondent argues on appeal, that the fact that the Legislature in 1977, the year that section 1203.09 was adopted, amended section 12022.7, a statute providing for increased punishment for a felony involving great bodily injury, to add a requirement that the defendant "personally" inflict such injury, but did not include the quoted word in section 1203.09, indicates that the Legislature must have intended that personal infliction of great bodily injury not be a condition for the application of section 1203.09.

Respondent further points out that section 1203.06, a statute precluding probation if a firearm is used in the commission of certain crimes, was also amended in 1977 to add a requirement that the firearm be personally used by the defendant. These amendments to sections 1203.06 and 12022.7 certainly show that the Legislature knew how to state specifically a requirement that for a statute to apply, the defendant must be personally involved in the offensive conduct. On the other hand, it also knows how to express the thought that a statute applies to a crime involving offensive conduct whether or not the defendant is the one personally involved. In 1977 section 12022, another statute providing for increased punishment for a "person who is armed with a firearm in the commission or attempted commission of a felony..." was amended to add the words "This additional term shall apply to any person who is a principal in the commission or attempted commission of a felony if one or more of the principals is armed with a firearm, whether or not such person is personally armed with a firearm." No comparable language is found in section 1203.09.

██ In construing a statute to determine the intent of the Legislature, the court "turns first to the words themselves for the answer." (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182 [217 P.2d 1]; *Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 764 [150 Cal.Rptr. 785, 587 P.2d 227].) Section 1203.09 states that probation shall not be granted

to a person "who during the course of [certain offenses] inflicts great bodily injury upon [a] person." It does not say that probation shall not be granted if a person is convicted of a crime in which great bodily injury is inflicted. It is true that some crimes are proscribed by statutes[5] which read that "Every person who commits. . ." the offense shall be punished in a certain way, and we know that those who aid and abet the offense may be punished under such statutes. ■■■ This is accomplished by section 31 which provides that persons who aid and abet in the commission of a crime "are principals in [the] crime so committed." Section 1203.09 does not define or proscribe a crime but rather affects the punishment or treatment of a person convicted of a crime. Thus section 31 does not apply to section 1203.09. Further the requirement of section 1203.09 that the defendant know or reasonably should know of the victim's disability seems to us to indicate that personal action by the defendant is the evil to which the statute is addressed.

We have not been able to find much in the way of legislative history that sheds light on the intent of the Legislature. For what value it may have, we note that the Report of the Assembly Committee on Criminal Justice for the 1977 General Session of the Legislature states in respect of Senate Bill No. 370, by which section 1203.09 was enacted, that "[u]nder this bill the power to grant probation in unusual cases will be removed totally in cases where. . .the defendant inflicts GBI on [a victim age 60 or over or blind or crippled]. . . ."

To summarize, the language of the statute seems to be directed toward the person who inflicts the great bodily injury rather than toward the crime in which the injury occurs. Such legislative history as is available emphasizes this aspect. The Legislature, in other statutes, has specifically included language spelling out the intention that the statute should apply only to a person who personally performed the offensive act, on the one hand, or to all persons involved as principals in the crime whether or not they personally performed the act, on the other. In enacting section 1203.09 it included neither type of specific language.

■■■ Another principle of law applicable to the construction of penal statutes is that if the statute is capable of two constructions, the one more favorable to the defendant will be adopted. (*In re Tartar* (1959)

---

[5]Section 245, subdivision (a), assault by means of force likely to produce great bodily injury, one of the charges in this case, is an example of such a statute.

52 Cal.2d 250, 256-257 [339 P.2d 553]; *People* v. *Rodriguez* (1963) 222 Cal.App.2d 221, 227 [34 P.2d 907].) For all of these reasons, we construe section 1203.09 to preclude probation only for those defendants who personally inflict great bodily injury and not for those who only aid and abet in a crime in which great bodily injury is inflicted. The trial court erred in instructing the jury to the contrary. This error was harmless, however, in respect of the determination of appellant's guilt. Except in regard to the jury's finding as to the application of section 1203.09, it is clear to us that a different verdict would not have been reached if the erroneous instruction had not been given. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The court instructed the jury that its duty to determine whether appellant inflicted great bodily injury in respect of count I arose only if it found him guilty of robbery, and the prosecutor in his summation informed the jury that "this first allegation under 1203.09 [*sic*] of the Penal Code, this comes into play only if you find [appellant] . . . guilty of robbery in Count I."

Respondent argues, however, that notwithstanding the jury's findings, the trial court treated appellant as though he were eligible for probation. It is true that the trial judge, in sentencing appellant's codefendant, adverted to section 1203.09 which "expressly states that probation shall not be granted nor execution of sentence suspended for anyone who commits a crime resulting in bodily injury to a person 60 years of age" and added "But I don't feel that that is the controlling thing here." He then referred to the viciousness of the crime and the advantages of commitment to the Youth Authority and denied the codefendant's application for probation. At the request of the prosecutor, he added a statement that he found that that defendant came within the provisions of section 1203.09 and rendered judgment in accordance therewith. As to appellant, he said he denied probation for the reasons he had theretofore stated with respect to the codefendant.

Many things pass through the mind of a sentencing judge and not all of them are fully articulated. It may or may not be true that same result would have occurred if the trial judge had known that section 1203.09 did not apply, but appellant is entitled to have his application for probation considered without an erroneous weight in the scales against him.

The judgment is reversed as to the denial of appellant's application for probation and commitment to the Youth Authority with directions

that such application shall be further considered and further proceedings had on the basis that section 1203.09 does not apply to appellant in this case; otherwise the judgment is affirmed.

Stephens, J., concurred.

**KAUS, P. J.**—I concur in all respects but one: I do not think it is necessarily a sufficient answer to appellant's *Aranda* point that Smith's statement did not accuse him of a crime. It seems to me that the rationale of *Aranda* is equally applicable to declarations of others offered for their patent falsehood if the nature and ambit of the declarant's mendacity indicates his belief in the objecting defendant's guilt. I agree, however, that under all the circumstances, appellant suffered no conceivable prejudice.